Filed 9/14/15  In re R.L. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.L. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E063177 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J240470 & J240471 & J252942) |
| v. | OPINION |
| E.Y., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Respondent.

Jean-Rene Basle, County Counsel, Adam Ebright, Deputy County Counsel, for Plaintiff and Respondent.

Defendant and appellant E.Y. (mother) appeals from the juvenile court's order terminating her parental rights under Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(i). For the reasons set forth below, we shall affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

Mother is the biological mother of four children: B.L. (a girl, born Sept. 2010—now four years old), R.L. (a girl, born Aug. 2011—now three years old), S.L. (a girl, born Nov. 2012—now two years old), and Z.R.[2] R.L. and B.L. came to the attention of San Bernardino County Children and Family Services (CFS) in August 2011; R.L. was born positive for methamphetamine and marijuana exposure. R.L. was immediately transferred to Loma Linda Medical Center due to respiratory distress and withdrawal symptoms. Mother, who was then 30 years old, admitted that she had been using methamphetamines since she was 17 years old. She had briefly stopped using drugs during her pregnancy with B.L., but used drugs throughout her pregnancy with R.L.

S.L. (father),[3] who had B.L. with him, initially attempted to evade the social worker to prevent her from seeing B.L. During this time, father fabricated documents indicating that B.L. and R.L. were under a guardianship with a relative. However, it was quickly determined that the documents were neither legal nor valid. Once the social

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2] Z.R. resided with a relative outside of California and is not a subject of this dependency.

[3] Father is not a party to this appeal.

2

worker was able to interview mother and father (collectively, "parents"), she discovered that both were substance abusers and had long histories of drug-related criminal charges. The social worker took B.L. and R.L. into protective custody.

The social worker prepared section 300 petitions alleging failure to protect under section 300, subdivision (b), due to the impacts of parents' long-standing substance abuse problems. At the detention hearing, the juvenile court found a prima facie case that B.L. and R.L. came under section 300 and ordered weekly visitation.

The social worker prepared a jurisdictional/dispositional report recommending that the court find the section 300 allegations true and order reunification services for parents. The social worker interviewed parents about their substance abuse history. Mother stated that she used methamphetamine daily while pregnant with R.L. until she was approximately 23 weeks pregnant. After that, she cut back to about once a month. Mother had unsuccessfully tried to stop using methamphetamine in 2008 through a residential treatment program. Father had relapsed after completing two treatment programs. Parents seemed to understand the root of their substance abuse problems and wanted to address them. The social worker characterized the prognosis for successful reunification as "guarded" because, although parents appeared to have a healthy attachment to B.L. and R.L., they used methamphetamine on a daily basis. It was unclear whether parents truly understood how much damage they had caused to B.L. and R.L. due to their drug use.

Meanwhile, R.L. remained in the intensive care unit and B.L. was placed in a foster home. B.L. was extremely tiny and was significantly underweight for her age. She

did not appear to be developmentally on track. Additional testing was necessary to identify the extent of B.L.'s developmental delays.

At the September 20, 2011, jurisdictional/dispositional hearing, the juvenile court accepted waivers from both parents and informed them that reunification services would be limited to six months because of the young ages of B.L. and R.L. The court sustained the petitions and ordered reunification services for parents.

The social worker prepared a status review report dated March 20, 2012, indicating that parents had failed to make significant progress over the previous six months. They had missed several drug tests and mother was terminated from her inpatient drug treatment program. Parents were unemployed, were living with a relative, and had no means of transportation. However, mother had enrolled in a second drug treatment program and began to attend her other classes. The social worker was hopeful that reunification was still possible if parents could complete and benefit from services, remain sober, avoid arrest and maintain stable transportation and housing. Parents continued to attend weekly visitation. The social worker observed that, aside from some inappropriate behavior by parents during visits, B.L., R.L. and parents appeared loving, attentive and bonded to one another. At the six-month review hearing, the court found that parents' progress had been minimal but continued reunification services for an additional six months.

The social worker prepared a status review report for the 12-month review hearing. The social worker recommended additional reunification services for parents. Parents continued to work on their case plans and provided clean drug tests. They had

4

moved into a sober living home and continued to participate in weekly visits. At the September 20, 2012, hearing, the court found that parents had made moderate progress in their case plans and continued services for an additional six months. The court also authorized overnight and weekend visits with approval.

The 18-month review report recommended that B.L. and R.L. be returned to parents under family maintenance. Parents had completed the majority of their case plan, remained sober, and had successful overnight/weekend visits. In November 2012, mother gave birth to another child, S.L. It was determined that S.L. could remain in parents' custody without court supervision.

At the February 26, 2013, hearing, the court found that parents had made substantial progress in their case plans and returned B.L. and R.L. to their care under a family maintenance plan.

B.L., R.L. and S.L. (collectively, "the children") remained with parents for the next eight months under family maintenance but parents' progress soon began to take a turn for the worse. Parents had to move out of their sober living home due to financial difficulties and they began to miss many of their random drug test appointments. Between April 2013 and January 2014, the social worker received four referrals through the Child Abuse Hotline alleging that both parents were using methamphetamine again. On September 4, 2013, the Children's Advocacy Group filed a section 388 petition to have B.L. and R.L. removed from parents, alleging that parents had stopped complying with the case plan, failed to drug test regularly, and were subjecting B.L. and R.L. to

unsafe living conditions. The petition was ultimately withdrawn. On January 22, 2014, CFS received a referral alleging that both parents had been altering their drug tests.

On January 24, 2014, the social worker filed a section 300 petition as to S.L. and section 387 petitions as to R.L. and B.L. The petitions alleged that ongoing drug use and domestic violence placed the children at risk and that the previous disposition had not been effective. The social worker prepared a new detention report explaining that on October 28, 2013, she received the first referral alleging that parents were using the children's urine to pass their drug tests. The testing site could not confirm this allegation. However, on January 16, 2014, the testing facility caught both parents trying to alter their urine test; parents were ejected. On January 17, 2014, after the social worker requested an on-demand test, the staff heard a popping sound and a suspicious flowing sound, which did not sound like the natural flow of urine, while mother was submitting her sample. Additionally, the social worker was concerned about domestic violence in the home over parents' recent separation. The social worker concluded that removal from the home was necessary due to the young age of the children, the reports of recent domestic violence, and the reports of parents altering their urine tests. At the January 27, 2014, detention hearing the court found that the previous disposition had not been effective in protecting the children and found a prima facie case for detention out of the home.

The social worker prepared jurisdictional/dispositional reports recommending that reunification services be denied for both parents and that a section 366.26 hearing be set. After the children's removal, mother went back to the testing facility and threatened the

6

staff members because she blamed them for causing her kids to be taken away. Father admitted that he had recently been arrested for possession of drug paraphernalia and that he had been using methamphetamine for several weeks. The social worker provided referrals for an outpatient drug treatment program, parenting classes, anger management classes, and counseling; parents failed to participate in any of them. Mother had been testing clean, but on February 17, 2014, she was arrested for felony burglary and possession of a controlled substance after attempting to shoplift from Walmart with the maternal grandmother. Mother admitted that she had relapsed into methamphetamine use.

At the April 15, 2014, jurisdictional/dispositional hearing, mother testified briefly about her recent arrest and the incidences of domestic violence. She stated that she had obtained the methamphetamine because she was upset about losing her kids, but claimed that she did not use them. Mother also testified that she wanted her kids back and that she had recently enrolled in a substance abuse class. The juvenile court found that the children came under section 300, subdivision (b), terminated reunification services for R.L. and B.L., and set a section 366.26 hearing to select a permanent placement plan. As to S.L., the court denied reunification services pursuant to section 361.5, subdivision (b)(10), and set the section 366.26 hearing to track with the older siblings.

The social worker prepared a section 366.26 report recommending the permanent plan of adoption and requesting additional time to complete the out-of-state placement with maternal relatives.

Over the next seven months, mother was arrested three times for possession of methamphetamine and was placed on felony probation. The arrests caused mother to miss several visits and the visits that did occur were problematic. The caregiver reported that mother would try to talk to the children about her new boyfriend and tell the children that they were "stolen" and she would get them back home soon. B.L. started to have behavioral problems before and after visits with mother; she hit herself, pulled her hair, and had incontinence, enuresis, defiance and sleeping problems. B.L. and R.L. started saying that they did not want visits with mother when they knew a visit was approaching.

Once the children were settled in their prospective adoptive home, the social worker prepared an addendum report dated February 17, 2015, recommending that the adoption be implemented. The children appeared happy in their prospective adoptive home and the behavioral problems that they had displayed when they were initially placed were improving quickly. The prospective adoptive mother reported that the children seemed happy and were always laughing amongst themselves. The prospective adoptive parents were committed to adopting the children and reported that the children had adjusted well and were a good fit for their family. The prospective adoptive father placed the children on his health insurance and the girls were scheduled for enrollment in a preschool that specialized in working with young children who had been traumatized.

The social worker set up phone visits between mother and the children three times a week at a designated time. The calls, however, started to have a negative effect on the children. After the first call, B.L. began to hit herself while at the dinner table; it left marks on her forehead. The children were reluctant to talk to mother. When they did

agree to talk, mother would bring up inappropriate topics and tell the children that she was going to come visit them without CFS involvement or approval.

The social worker concluded that the children were appropriate for adoption and asked the court to free them for adoption. The prospective adoptive parents were committed to meeting the children's needs and raising them into adulthood. The social worker opined that the children would benefit from having parents who had their best interests at heart and were willing to meet the children's physical, educational, social, emotional, and psychological needs.

At the time of the section 366.26 hearing, mother was incarcerated but was present at the hearing. Mother testified that she had tried to visit the children as much as she was able to. However, after the children were placed in the prospective adoptive home, mother was only allowed phone visits. The children's attorney reported that the prospective adoptive parents were extremely committed to the children and that the children were thriving in their care. The children called the prospective adoptive parents "mom" and "dad" and were forming close attachments with them. The children's counsel noted that the children's therapist recommended immediately establishing permanency for the children.

The juvenile court found that the children were likely to be adopted and ordered adoption as the permanent plan. The court noted that the children were reluctant to speak to mother and they were bonded with the prospective adoptive parents. The court expressly found that parents had not met their burden in establishing the parental bond exception in the case and terminated parental rights.

## DISCUSSION

A.    <u>THE PARENTAL BENEFIT EXCEPTON DID NOT APPLY</u>

Mother claims that the juvenile court erred when it terminated her parental rights because the parental benefit exception applied.

In general, at a section 366.26 hearing, if the juvenile court finds that a child is adoptable it must terminate parental rights.  (§ 366.26, subds. (b)(1) & (c)(1).)  This rule, however, is subject to a number of statutory exceptions (§ 366.26, subds. (c)(1)(A) & (c)(1)(B)(i)-(vi)), including the beneficial parental relationship exception, which applies when "termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

"When applying the beneficial parent-child relationship exception, the court balances the strength and quality of the parent-child relationship in a tenuous placement against the security and sense of belonging that a stable family would confer on the child. If severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.'" (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1234-1235.)

"'[F]or the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.'" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938.)  The parent must show more than frequent and loving contact or pleasant

visits. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) "'A biological parent who has failed to reunify with an adoptable child may not derail adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be *beneficial to some degree*, but that does not meet the child's need for a parent.'" (*Jason J.*, at p. 937.)

"The parent contesting the termination of parental rights bears the burden of showing both regular visitation and contact and the benefit to the child in maintaining the parent-child relationship." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81.) This court must affirm a juvenile court's rejection of these exceptions if the ruling is supported by substantial evidence. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.) We review "the evidence most favorabl[e] to the prevailing party and indulg[e] in all legitimate and reasonable inferences to uphold the court's ruling." (*In re S.B.* (2008) 164 Cal.App.4th 289, 297 (*S.B.*).) Because Mother had the burden of proof, we must affirm unless there was "indisputable evidence [in her favor, which] no reasonable trier of fact could have rejected." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 200.)

In this case, mother did not meet her burden of proving that the beneficial parental relationship exception applied. Mother failed to meet the first requirement of the exception—that she regularly visited the children. (§ 366.26, subd. (c)(1)(B)(i).) Here, mother visited consistently during the first 18 months of reunification services. However, once mother relapsed into methamphetamine use and criminal activity, she failed to

maintain consistent visitation. Although the record reflects that mother did visit when possible, she was arrested three times after reunification failed, which interfered with her ability to visit with the children. Additionally, the visits became problematic and the children began displaying behavioral problems when the visits occurred.

Even if mother visited regularly and consistently, the beneficial parental relationship exception requires *both* regular visitation *and* benefit to the child. Here, mother has failed to establish benefit to the children.

The second requirement for the parental benefit exception to apply requires that mother prove that the children would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).) "The existence of this relationship is determined by '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1206, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567.)

In this case, at the time of the section 366.26 hearing, the oldest child, B.L., was only four years old; R.L. and S.L. were three and two, respectively. When B.L. was initially removed she was only 11 months old; when S.L. was initially removed she was only one year old. R.L. was removed at birth. Therefore, B.L. only spent 11 months of her life in mother's care before CFS became involved, and three years out of mother's custody. R.L. spent her entire life either in the custody of CFS or under its supervision. S.L. spent approximately a year in mother's custody while the other siblings' cases were

12

ongoing before she also had to be removed. Accordingly, the majority of the children's lives were spent out of mother's custody.

Although the record contains multiple references to the positive interactions that parents had during their period of sobriety and while receiving reunification services, the interactions outside of this window were decidedly negative. Before the involvement of CFS, during the 11 months that B.L. was in mother's custody, the parents used methamphetamine on a daily basis. As a result, R.L. was born positive for methamphetamine and rushed to the intensive care unit with respiratory problems. When B.L. was removed, she was extremely underweight and appeared to have developmental problems.

Likewise, after reunification efforts failed, visitation became sporadic and the visits that did occur became problematic. Mother would discuss inappropriate subjects and tell the children that they were "stolen." B.L. started to have behavioral problems before and after visits with mother, including, hitting herself, hair pulling, incontinence, enuresis, defiance, and sleeping problems. B.L. and R.L. started to say that they did not want to visit with mother. Mother was arrested three times for possession of methamphetamine, was placed on felony probation, and was still incarcerated at the time of the section 366.26 hearing. The children began to stabilize in their prospective adoptive placement but once phone visits were established, the children started demonstrating behavioral problems again. After the first phone call, B.L. began hitting herself while at the dinner table and leaving marks on her forehead. The other children were reluctant to talk to mother.

13

Based on the above, most of the interaction mother had with the children did not show that the children would benefit from continuing the relationship with mother.

Furthermore, the children had no special physical or psychological needs other than those caused by mother. Instead, they had the normal needs for a safe, stable and loving environment. Unfortunately, after two years of services, mother was unable to provide that for her children. On the other hand, the children were enjoying that type of environment in their prospective adoptive home. The prospective adoptive parents were committed to raising the children into adulthood and willing to meet their physical, educational, social, emotional and psychological needs. The children appeared happy in their home and the behavioral problems that they displayed when they were initially placed were improving quickly. The prospective adoptive parents were committed to adopting the children and reported that the children had adjusted well and were a good fit for their family. By the time of the section 366.26 hearing, the children were calling them "mom" and "dad" and were forming close attachments. The children's therapist recommended immediately establishing permanency for the children through adoption.

In her reply brief, mother relies on *S.B.*, *supra*, 164 Cal.App.4th 289, in which the appellate court concluded that the juvenile court erred in declining to apply the beneficial relationship exception. (*Id.* at p. 301.)

"The *S.B.* case has been criticized by other appellate courts for its suggestion the exception applies if the child merely 'derived some measure of benefit' from the parental relationship. (*S.B.*, *supra*, 164 Cal.App.4th at p. 301.) The same appellate court that authored the *S.B.* case cautioned in *In re Jason J.*[, *supra*,] 175 Cal.App.4th [at p.] 937

14

[. . .]: 'The *S.B.* opinion must be viewed in light of its particular facts.  It does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is "some measure of benefit" in continued contact between parent and child.'  More recently, the same court emphasized in *In re C.F.* (2011) 193 Cal.App.4th 549, 558-559 [. . .] that the *S.B.* case must be 'confined to its extraordinary facts.  [The *S.B.* case] does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact.'" (*In re J.C.* (2014) 226 Cal.App.4th 503, 530.)

Moreover, *S.B.* is distinguishable.  In *S.B.*, the child was in her father's care until she was three years old.  (*S.B.*, *supra*, 164 Cal.App.4th at p. 293.)  When she was removed, the father "immediately recognized that his drug use was untenable." (*Id.* at p. 298.)  He started services, "complied with 'every aspect' of his case plan" and placed the child's needs above his own.  (*Ibid.*)  The child tried to leave with the father when the visits were over.  (*Id.* at p. 294.)  Here, in contrast, B.L. only spent 11 months of her life in mother's care before CFS became involved, and three years out of mother's custody. R.L. spent her entire life either in the custody of CFS or under its supervision in a family maintenance plan.  S.L. spent approximately one year in mother's custody while the other siblings' cases were ongoing before she had to be removed.  Hence, unlike the child in *S.B.*, the majority of the children's lives, if not all, were spent out of mother's custody. Moreover, although mother initially made progress in her reunification plans, she relapsed after the children were returned to her care under a family maintenance plan. Mother started to use methamphetamine again, was arrested for possession of

15

methamphetamine on three occasions and placed on felony probation. After these incidents, the visits between the children and mother became problematic. B.L. and R.L. began to say that they did not want to visit with mother. Unlike the father in *S.B.*, mother failed to place the children's needs above her own. Therefore, we find that mother's reliance on *S.B.*, *supra*, to be misplaced.

Based on the above, we agree with the trial court that mother failed to meet her burden of showing that the parental benefit exception applied.

In sum, mother has the burden to establish the applicability of the beneficial parental relationship exception in the lower court; on appeal, she has the burden of showing that the juvenile court's ruling was an abuse of discretion. We conclude that mother has failed to meet this burden.

## DISPOSITION

The judgment terminating mother's parental right is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
J.

We concur:

KING _____
Acting P. J.

CODRINGTON _____
J.

16